IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SARAH ELIZABETH STELZMAN,** | : | **Civil No.  1:22-CV-82** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

1

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Sarah Stelzman applied for disability insurance benefits under Title II Social Security Act on August 5, 2018, alleging an onset date of disability of March 14, 2017. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Stelzman was not disabled during the relevant period and denied Stelzman's application for benefits. Stelzman now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

Stelzman filed her claim for supplemental security income on August 5, 2018, alleging an onset date of March 14, 2017, and her date last insured was March 31, 2019.[1] (Tr. 15). Stelzman alleged disability due to the following impairments:

---

[1] Because Stelzman had a prior Title II application denied on March 13, 2017, and the plaintiff did not appeal this determination, the parties agree that the doctrine of

chronic pain syndrome, thoracic back pan, myositis; spondylolisthesis at L5 and S1; lumbar spondylosis; severe multilevel degenerative disc disease; sleep hyperhidrosis; acute and subacute herniated discs; osteoarthritis; fractured vertebrae; twisting spine syndrome; narcolepsy with cataplexy, hypersomnia; and anxiety with major depressive disorder. (Tr. 324). She was 30 years old at the time of her date last insured, had at least a high school education, and had past relevant work experience as a merchandise displayer and stock control clerk. (Tr. 26-28).

With respect to Stelzman's impairments, the medical record revealed the following: Stelzman had a history of back pain, narcolepsy with cataplexy, and depression. On this score, Stelzman treated with Dr. Steven Evans, D.O., for her lumbar spondylosis, low back pain, scoliosis, and thoracic back pain. In March of 2017, Stelzman reported back pain and sleep disturbance, but no depression. (Tr. 777). On examination, she exhibited decreased range of motion in her cervical, thoracic, and lumbar spine, but had a negative straight leg raise test, a normal gait and station, and 5/5 motor strength. (Id.) An examination in May of 2017 revealed similar findings, and Dr. Evans recommended a nonimpact aerobic exercise program and nonpharmacological pain control methods. (Tr. 773-74). In October of 2017, it

---

res judicata applies with respect to the plaintiff's date of alleged onset of disability. (Tr. 15).

was noted that Stelzman was prescribed narcotics to help with her pain management. (Tr. 767).

At the same time, Stelzman as treating with Dr. Stanford Feinberg, M.D., for her narcolepsy, chronic fatigue, major depressive disorder, and other impairments. Thus, in April 2017, Dr. Feinberg noted that Stelzman was taking Klonopin and was sleeping through most of the night and that she did not take naps. (Tr. 732). Dr. Feinberg prescribed Adderall to help keep her awake during the day. (Tr. 733). He noted that Stelzman had been managing her depression with medication, but she lost her job, and Dr. Feinberg recommended that she may benefit from therapy and a different regimen. (Id.) In May of 2017, it was noted that Stelzman had run out of her medication and was having difficulty staying awake during the day, but that she was able to function when she took stimulants. (Tr. 729). Dr. Feinberg also noted that Stelzman had been participating in art shows where she sold her art. (Id.) In June, Dr. Feinberg's notes indicate that Stelzman had no difficulty falling asleep and rarely took naps, and that she was working part time at a greenhouse and also sold her art. (Tr. 726). He noted that the combination of her medications helped her stay awake throughout the day, and that she was set to start therapy. (Tr. 727).

In August 2017, Stelzman reported that her pain was under better control with the new medication from her pain specialist. (Tr. 720). Regarding her narcolepsy,

Stelzman was prescribed a higher dose of her medication in October of 2017, because her insurance would only cover Vyvanse. (Tr. 718). She reported excessive sleepiness in November of 2017, and Dr. Feinberg discussed starting her on a new medication. (Tr. 715). It was also noted that she started occupational and physical therapy, which she believed was helping. (Tr. 714). In December, Dr. Feinberg's notes indicate that the new medication was helping with her narcolepsy, noting that it "[s]eems to be helping her stay awake until evening which has not been happening for awhile." (Tr. 711).

Occupation therapy notes indicate that Stelzman treated from September 2017 to November 2017. A treatment note from October indicated that Stelzman was "doing pretty good with [her] pain." (Tr. 589). Stelzman reported that she and her boyfriend were taking turns lifting and moving things. (Id.) It was noted that Stelzman was making progress toward her goals, and that she would benefit from continued physical therapy. (Tr. 607). Ultimately, Stelzman self-discharged from therapy. (Tr. 626). She was seen by Dr. Martin Cheatle, Ph.D. for a follow up in December of 2017. (Tr. 647). Dr. Cheatle's notes indicated that Stelzman's mood was improved and stable, and that her memory, concentration, and attention were normal. (Id.) It was recommended that Stelzman establish care with a psychiatrist

and therapist for her depression, and that she continue her home exercise program and stress/pain coping skills. (Id.)

In February of 2018, Dr. Feinberg noted that Stelzman continued to take high doses of narcotic medications to help with her pain. (Tr. 705). Stelzman reported no side effects from any of the medication she was taking, including her medications for her narcolepsy. (Id.) Dr. Feinberg further noted that the combination of her medications was helping keep Stelzman awake throughout the day. (Tr. 706). Regarding her chronic fatigue, Dr. Feinberg's notes indicate that there was a correlation between lack of sleep and her pain. (Id.) At this time, Stelzman continued to treat with Dr. Evans for her pain, and Dr. Evans' notes indicated that Stelzman had some decreased range of motion but full motor strength and a normal gait and station. (Tr. 762-63). Dr. Evans recommended that she continue with her course of treatment, and that she would be a good candidate for medical marijuana. (Tr. 763).

In July of 2018, Dr. Evans noted that Stelzman was stable on her current dosing, but told Stelzman he would not increase her medication and discussed with her reducing her opiate exposure in the future. (Tr. 755). On examination, Stelzman exhibited decreased range of motion in her spine, but her motor strength was 5/5 and she had a negative straight leg raise test. (Id.) At this time, Dr. Feinberg's notes indicate that Stelzman was interested in medical marijuana but could not afford it.

(Tr. 690). Dr. Feinberg also changed her medications for her narcolepsy, suggesting she start Provigil. (Tr. 687). A treatment note from August of 2018 reported that Stelzman appeared sleepy and fatigued. (Tr. 684).

Dr. Linda Brown, M.D., Stelzman's sleep medicine specialist, filled out a Disability Impairment Questionnaire in September of 2018. (Tr. 660-64). Dr. Brown noted that she had treated Stelzman on a monthly basis since June of 2015 for her narcolepsy. (Tr. 660). She described Stelzman's symptoms as excessive daytime sleepiness and intermittent, uncontrollable episodes of falling asleep during the day at any time. (Tr. 661). Dr. Brown opined that Stelzman could sit 4 hours and stand/walk 3 hours in an 8-hour workday; she could lift and carry up to 10 pounds occasionally; her attention and concentration would occasionally be interfered with; she would need to move around from a seated position every 2 hours; she would need 1 to 2 unscheduled breaks per day to take a 20-to-30-minute nap; and she would be absent more than three times per month. (Tr. 661-64). The record also contains a September 2018 "To Whom it May Concern" letter from Dr. Brown describing the symptoms of narcolepsy with cataplexy. (Tr. 669). She described Stelzman's prior history with narcolepsy and medication management, and further described what symptoms a person with narcolepsy typically experiences daily. (Id.)

7

In November of 2018, Dr. Evans noted that Stelzman's urine test came back positive for cocaine, and he informed Stelzman that he would no longer prescribe her narcotics. (Tr. 751). Stelzman was informed she either needed to enroll in detox/rehab or find another provider, and Stelzman opted to find another provider. (Id.)

In January of 2019, Stelzman underwent a mental status evaluation with Dr. Krista Coons, Psy.D. (Tr. 854-61). On examination, Stelzman's speech was fluent and clear; her thought process was coherent and goal-directed; her affect was flat, and her mood was neutral; her attention and concentration were intact; her insight was good, and her judgment was fair. (Tr. 856-57). Stelzman reported difficulty falling asleep and waking throughout the night due to her pain. (Tr. 855). She stated that she felt depressed daily, and that she had some anxiety. (Id.) Stelzman was able to dress, bathe, and groom herself, and she could shop, manage money, and drive short distances. (Tr. 857). She reported that her boyfriend did most of the cooking, cleaning, and laundry. (Id.) Dr. Coons diagnosed Stelzman with major depressive disorder and listed her prognosis as fair. (Tr. 857-58). In her medical source statement, Dr. Coons found only mild limitations in areas of functioning such as understanding and remembering complex instructions; carrying out complex

instructions; and ability to make judgments on complex work-related decisions. (Tr. 859).

Stelzman continued treating with Dr. Feinberg in January of 2019. On this score, Dr. Feinberg noted that Stelzman was in a lot of pain due to being off her narcotic pain medication, which affected her sleep, and she was seeing a new pain doctor the following week. (Tr. 888). Regarding her depression, Dr. Feinberg indicated that she was continuing her medication and seeing a therapist regularly, and that her depression was in partial remission. (Tr. 890). At or around this time, Stelzman had an X-ray of her lumbar spine, which showed mild thoracolumbar levoscoliosis, grade 1 L5 on S1 anterolisthesis with facet arthropathy, and no significant lumbar degenerative changes. (Tr. 992). Records from St. Luke's University Health Network from this time indicated that Stelzman had decreased range of motion in her lumbar spine with pain upon flexion, muscle spasms, 4/5 motor strength in the bilateral lower extremities, and a positive straight leg raise test. (Tr. 955). She was referred to physical therapy. (Tr. 956).

Initial intake physical therapy records from February of 2019 note that Stelzman had functional deficits including decreased capacity with sitting, lifting/carrying, transfers, and bending over, and she rated her current pain as a 5/10. (Tr. 957). At later visits in February, Stelzman reported that she believed she was

9

seeing mild improvement from physical therapy, the exercises were getting easier, and the intensity of her pain was lessening at times. (Tr. 962, 964). At this time, treatment notes from Dr. Feinberg indicate that Stelzman's pain medications were making her sleepy. (Tr. 892). In March of 2019, Stelzman reported that her medications for her narcolepsy helped her get to sleep and stay asleep, but that she sometimes woke up twice during the night. (Tr. 896). Physical therapy notes from this time stated that Stelzman was making slow progress, but her symptoms remained consistent. (Tr. 969). Stelzman reported that she had relief after each session. (Tr. 969, 972). However, Stelzman's new pain management provider, Dr. McKenzie, scheduled a bilateral L4-L5 and L5-S1 medial branch block to help her lower back pain after she reported no true change in her pain. (Tr. 974).

Following the relevant time period, Stelzman received injections in April of 2019 but reported that they did not help her symptoms. (Tr. 990). At this time, she reported to Dr. Feinberg that she was working as a florist 6 days per week. (Tr. 1054). The record also contains a job application for a billing/paperwork position in April of 2019. (Tr. 1163).

In February of 2021, almost two years after the relevant period in this case, Stelzman underwent an orthopedic examination with Dr. Ziba Monfared, M.D., a consultative examiner. (Tr. 1022-31). Dr. Monfared noted her history of narcolepsy

with cataplexy, and further noted that Stelzman reported she was told to stop driving. (Tr. 1022). Stelzman reported that she lived alone, and that family members helped her around the house. (Tr. 1023). She cooked, cleaned, shopped, and did laundry twice per week. (Id.) On examination, Stelzman had a normal gait and station and 5/5 strength in her upper and lower bilateral extremities with no evident joint deformity. (Tr. 1024). Dr. Monfared listed her prognosis as fair. (Tr. 1025). Dr. Monfared further opined that Stelzman could frequently lift and carry up to 10 pounds; sit for 8 hours and stand and walk for 4 hours in an 8-hour workday; frequently climb ramps and stairs, balance, stoop, and crawl, and occasionally climb ladders or scaffolds, kneel, and crouch; and could never be exposed to unprotected heights or operate a motor vehicle. (Tr. 1026-30).

Similarly, Dr. Brown filled out a Disability Impairment Questionnaire after the relevant period in March of 2021. (Tr. 1175-79). Dr. Brown opined that Stelzman could sit for 3 hours and walk or stand for less than 1 hour in an 8-hour workday; could frequently reach but could only occasionally grasp, turn, and twist objects and use hands and fingers for fine manipulation; her concentration and attention would be affected frequently because of her pain, fatigue, or other symptoms; she would need unscheduled breaks; and she would be absent more than 3 times per month.

(Tr. 1177-79). Dr. Brown noted that some of Stelzman's issues were caused by insurance not paying for her medications. (Tr. 1179).

Dr. Brown also filled out a sleep questionnaire in April of 2021. (Tr. 1309-13). She listed Stelzman's clinical findings as excessive daytime sleepiness and chronic fatigue. (Tr. 1309-10). Dr. Brown opined that Stelzman had serious limitations in understanding, remembering, and carrying out simple instructions; maintaining attention for two-hour segments; being punctual within customary, usually strict tolerances; performing at a consistent pace; and using public transportation. (Tr. 1312). She further opined that Stelzman would need breaks in order to nap, and that she would be absent about 2 or 3 times per month. (Tr. 1313).

It is against this medical backdrop that the ALJ held a telephonic hearing on Stelzman's claim on March 31, 2021.[2] (Tr. 36-70). At the hearing, both Stelzman and a Vocational Expert testified. (Id.) By a decision dated May 26, 2021, the ALJ denied Stelzman's application for benefits. (Tr. 12-35).

In that decision, the ALJ first concluded that Stelzman met the insured status requirements under the Act on March 31, 2019, and had not engaged in any substantial gainful activity since her alleged onset date of March 14, 2017. (Tr. 18).

---

[2] Stelzman's claim was initially denied by the ALJ on January 30, 2020. On October 16, 2020, the Appeals Council remanded the case for further proceedings. (Tr. 15).

At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Stelzman had the following severe impairments: cervical radiculopathy, spondylolisthesis at L5 and S1, lumbar spondylosis, osteoarthritis, and narcolepsy with cataplexy. (Id.) The ALJ found Stelzman's depression and anxiety to be nonsevere impairments, concluding that she had only mild limitations in the areas of functioning. (Tr. 18-20). At Step 3, the ALJ determined that Stelzman did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 20-21).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Stelzman's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except avoid exposure to unprotected heights and industrial machinery. She should avoid climbing ladders or scaffolds but can occasionally climb ramps or stairs. She can occasionally balance, kneel, stoop, crouch, and crawl. The claimant can tolerate occasional exposure to extreme cold temperatures, wetness, and vibration. She is capable of frequent use of her bilateral upper extremities for reaching in all planes. She is capable of pushing and pulling with her bilateral upper extremities. In addition, she can make occasional use of her bilateral lower extremities for operation of foot controls or pedals. She should avoid occupations that would expose her to noise above level 3 noise intensity level.

(Tr. 21).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Stelzman's testimony regarding her impairments. On this score, the ALJ considered the opinions of Dr. Brown and Dr. Monfared as outlined above, as well as two opinions from state agency consulting doctors. (Tr. 26-27). Regarding Dr. Monfared's February 2021 opinion, the ALJ found the opinion somewhat persuasive, reasoning that it was supported by a direct examination of the plaintiff but was based on a one-time encounter with the plaintiff and was not entirely consistent with the record as a whole. (Tr. 26). The ALJ did, however, note consistencies between Dr. Monfared's opinion and the relevant record, such as reaching limitations. (Tr. 26-27).

Regarding Dr. Brown's opinions, the ALJ found Dr. Brown's September 2018 opinion to be of limited persuasiveness. (Tr. 26). The ALJ reasoned that the limitations as described by Dr. Brown were generally consistent with a sedentary level of work but found that her limitations regarding absences and the need for unscheduled breaks was not supported by the record. (Id.) The ALJ cited treatment records that indicated Stelzman's narcolepsy medications were working and kept her awake throughout the day. (Id.) Further, the ALJ reasoned that Dr. Brown's limitations regarding attention and concentration were not supported by the record, which showed objective findings of normal concentration and goal directed thought

processes on mental status examinations, as well as Stelzman's activities of daily living. (Id.) The ALJ found Dr. Brown's March 2021 opinion partially persuasive, in that the record supported Dr. Brown's limitations regarding climbing, heights, power machines, and hazardous conditions. (Tr. 27). However, the ALJ found that Dr. Brown's opinion was not persuasive as to the need for unscheduled breaks or to refrain from driving a motor vehicle, as the records from the relevant time period showed that Stelzman drove herself to appointments, and that her medication for her narcolepsy was working. (Id.) The ALJ also noted that the relevant treatment records showed largely normal mental status examination findings, as well as the fact that Stelzman was working part time. (Id.)

The ALJ also considered the opinion of Dr. John Simmons, M.D., a state agency consultant, and found this opinion largely persuasive. (Tr. 25-26). Dr. Simmons opined in January of 2019 that Stelzman was limited to sedentary work, in that she could occasionally lift or carry up to 10 pounds; stand or walk for 2 hours and sit for 6 hours in an 8-hour workday; could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl; was limited in reaching with her bilateral upper extremities; and should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. 117-22). The ALJ reasoned that this opinion was supported by and consistent with detailed treatment records

from the relevant period, which showed some musculoskeletal abnormalities caused by pain and tenderness, and it considered the plaintiff's effects of her narcolepsy on her day-to-day activities. (Tr. 25).

The ALJ further considered the opinion of Dr. Salvatore Cullari, Ph.D., who opined in January of 2019 that Stelzman had only mild limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting or managing oneself. (Tr. 115). The ALJ reasoned that this opinion was consistent with that of Dr. Coons and found both of these opinions to be persuasive because they were supported by the treatment records which showed no hospitalizations, conservative treatment, medication management, and no longitudinal therapy. (Tr. 25).

The ALJ also considered Stelzman's testimony but ultimately found that Stelzman's complaints were not entirely consistent with the medical evidence of record. (Tr. 22). Stelzman testified that during the relevant time period, she fell asleep 4 times a day, and she slept only 5-6 hours per night. (Tr. 48, 57). She stated that she had daily mental health symptoms, but that she was taking Wellbutrin and Cymbalta. (Tr. 56). She reported that her back pain worsened her depression symptoms. (Tr. 49). She further testified that she did not experience any side effects from her medications, and that she was working at a flower shop in 2019 part time,

16

but that she had to resign her position because of concentration issues. (Tr. 52-54). She stated that she could sit comfortably for only 20 minutes, stand for 25 minutes, walk 2 blocks, and carry 12 to 15 pounds. (Tr. 49-50). Regarding her activities of daily living, Stelzman testified that she was able to cook, clean, do laundry, and drive, and that she did recycling art as a hobby. (Tr. 50).

Ultimately, the ALJ found that Stelzman's testimony was not consistent with the record evidence. (Tr. 22-25). The ALJ noted that treatment records showed that her narcolepsy medication was working and she was able to function, although she did have period where her insurance was a barrier to her medication. (Tr. 23). The ALJ further noted that although Stelzman had some musculoskeletal abnormalities and back pain, her examinations routinely showed a normal gait and station and full motor strength. (Tr. 23-24). Moreover, the ALJ noted Stelzman's activities of daily living, along with the fact that Stelzman was working part time and doing art shows during the relevant period. (Tr. 23-25).

Having arrived at this RFC assessment, the ALJ found at Step 4 that Stelzman could not perform her past relevant work. (Tr. 27-28). The ALJ then made a finding at Step 5 that Stelzman could perform work available in the national economy as an order clerk, addresser, and compact assembler. (Tr. 28-29). Accordingly, the ALJ

concluded that Stelzman did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 29).

This appeal followed. (Doc. 1). On appeal, Stelzman contends that the ALJ failed to properly consider the opinions of Dr. Brown. Stelzman also asserts that the ALJ's RFC determination failed to account for her mental limitations, as well as the combined effects of her chronic pain and narcolepsy. Finally, Stelzman contends that the ALJ failed to consider her subjective symptoms. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks

omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d

Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.**     **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).   RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."   Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).   In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.   20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

23

(quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

24

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec</u>., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application in August of 2018 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However,

in March of 2017, the Commissioner's regulations governing medical opinions

changed in a number of fundamental ways. The range of opinions that ALJs were

enjoined to consider were broadened substantially, and the approach to evaluating

opinions was changed from a hierarchical form of review to a more holistic analysis.

As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." <u>Revisions to Rules
> Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u>
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg.
> 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20
> C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to

"supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." Chandler

v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.   Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also

illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare,* 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a

finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves

whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

### E. The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Stelzman was not disabled. Therefore, we will affirm this decision.

At the outset, Stelzman contends that the ALJ did not properly consider the opinion of her treating doctor, Dr. Brown. Stelzman asserts that the ALJ only explicitly evaluated the persuasiveness of one of Dr. Brown's opinions but not the other two opinions. Moreover, Stelzman asserts that the ALJ's reasoning for finding Dr. Brown's opinions partially persuasive were not adequately articulated. We first note again that the question of disability is a legal determination and is not wholly dictated by medical opinions. Indeed, it is well settled that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191

F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

Here, the ALJ examined Dr. Brown's opinions from 2018 and 2021 and found the opinions only partially persuasive with respect to certain limitations. The ALJ explained that while Dr. Brown's 2018 opinion was generally consistent with sedentary level work, the limitations regarding absences and breaks was not supported by evidence in the record, which showed that Stelzman's narcolepsy medications were keeping her awake throughout the day. The ALJ further noted that none of Stelzman's treatment records supported Dr. Brown's limitations in attention and concentration. Regarding Dr. Brown's 2021 opinion, which was rendered nearly two years after the date last insured, the ALJ found this opinion persuasive as to the limitations avoiding hazards and machinery, but again found that the limitations regarding absences and breaks were not supported by Dr. Brown's own treatment records during the relevant time.

Thus, the ALJ adequately explained his reasoning for finding parts of Dr. Brown's opinions persuasive and the remaining limitations unpersuasive, citing record evidence to support his reasoning. The ALJ further explained that he found

the other medical opinions rendered by the state agency consultants more persuasive, including the opinions of Dr. Simmons, Dr. Cullari, Dr. Coons, and Dr. Monfared. Indeed, the ALJ reasoned that these opinions were consistent with Stelzman's treatment notes from the relevant time period, which showed that her medications were working, and that although Stelzman experienced pain and had some musculoskeletal abnormalities, her examinations showed full motor strength and a normal gait and station, and she was working part time during the relevant period.

The ALJ also considered Stelzman's testimony but concluded that her subjective complaints were not entirely consistent with the medical record. The ALJ reasoned that while Stelzman testified as to her need to nap daily and her inability to stay awake, the record evidence showed that her medications were working and she was able to stay awake throughout the day. Moreover, although Stelzman testified that she could not work due to her chronic pain, Stelzman's objective examinations showed full motor strength and a normal gait and station, and she was working part time as a florist and selling her artwork at galleries during the relevant time. The ALJ also found that Stelzman's own reported activities of daily living undercut her subjective complaints, as she stated she could cook, clean, do laundry, shop, socialize, and drive to her appointments.

On this score, the ALJ was confronted by several medical opinions, which including varying limitations based on the plaintiff's impairments. The ALJ considered all of these opinions against the objective medical evidence in the record and explained why some opinions were partially or largely persuasive and why he found other opinions, including Dr. Brown's, inconsistent with the medical evidence. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. The ALJ also considered Stelzman's subjective complaints but found that they were inconsistent with the record as a whole. Accordingly, we find that the ALJ considered all of the medical evidence and adequately explained his reasoning for the persuasiveness given to the various medical opinions in this case to determine the range of work Stelzman could perform.

Stelzman further asserts that the ALJ did not account for her combination of impairments in the RFC, including her nonexertional mental limitations and the combination of her narcolepsy and chronic pain. At the outset, we note that the plaintiff is not challenging the ALJ's finding that her depression and anxiety were nonsevere. Moreover, it is well settled that "an RFC assessment does not need to contain an in-depth analysis on mental impairments when the ALJ finds earlier in

his opinion that a claimant's mental impairments are no greater than mild." D.C. v.

Comm'r of Soc. Sec., 2021 WL 1851830, at *6 (D.N.J. May 10, 2021) (collecting

cases). Further, courts in this circuit have found that "when an ALJ explicitly states

that he has considered the entire record when formulating the RFC, he has satisfied

the requirement of considering the plaintiff's impairments in formulating the RFC."

Northrup v. Kijakazi, 2022 WL 889968, at *4-5 (M.D. Pa. Mar. 24, 2022) (Schwab,

M.J.) (collecting cases).

 In the instant case, the ALJ found that Stelzman had only mild impairments

in the four broad areas of mental functioning. He explained that this finding was

supported by the opinions of Dr. Simmons and Dr. Coons, both of whom found that

the plaintiff suffered only mild impairments in these areas. Additionally, the ALJ's

opinion explicitly states that "[t]he following residual functional capacity reflects

the degree of limitation the undersigned has found in the 'paragraph B' mental

function analysis." (Tr. 20). Thus, we find that the ALJ's decision has satisfied the

requirement that he consider all of the plaintiff's impairments in formulating the

RFC. Further, to the extent that the plaintiff contends that the ALJ failed to consider

her narcolepsy in conjunction with her pain, the ALJ explicitly found Dr. Simmons'

opinion persuasive because it "consider[ed] the fact that the claimant's narcolepsy

did affect her day-to-day activities to some extent due to symptoms such as fatigue."

Further, we find that any error in the ALJ's omission of mental limitations in the RFC would be harmless. Social Security appeals are subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.'" Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

39

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

Here, the ALJ submitted a series of hypotheticals to the VE. Some hypotheticals contained mental limitations, others did not. (Tr. 64-67). In response to a hypothetical from the ALJ which included limitations from her mental impairments, such as limiting Stelzman to occasionally making work-related decisions and avoiding fast-paced production work, the vocational expert testified that the same jobs the ALJ found Stelzman could perform would still exist in the national economy. (See Tr. 67). However, the VE's testimony read as a whole indicates that Stelzman could also perform these tasks, even if she was not subject to these mental restrictions in the workplace. (Tr. 64-66). Simply put, the ALJ's testimony seems to indicate that Stelzman could perform these tasks with or without the mental limitations proposed by the ALJ. Accordingly, on these facts, any error in omitting those limitations from Stelzman's RFC is harmless and would not constitute grounds for remand.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus,

notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: January 5, 2023